Mr. Dubonnet may proceed. Good morning, Your Honors. My name is Alex Dubonnet and I represent Appellant Alex Villanueva. I would like to reserve three minutes for rebuttal and of course I'll keep track of my own time. With all due respect to the District Court, which Appellant certainly has, we believe the District Court did err in entering summary judgment for a number of reasons and we would respectfully ask this court to reverse. As you're aware, the first basis for summary judgment was lack of standing. We don't think that was correct as a matter of law. The plaintiff did submit a declaration that said that he was prevented from applying for county employment solely because of the do not rehire designation in his personnel file. Construing the evidence most favorably to him, which the District Court failed to do. That notation has nothing to do with elective office. Did he put forward any evidence that he had concrete plans or any kind of plans to acquire non-elective office to which that might be applicable? There was, Your Honor, with his declaration in opposition to the motion to strike, he mentioned two specific positions he wanted. One with the city's attorney's office as a consultant and to go back to the sheriff's office if the new sheriff would have him to consult there. And those were his positions. It is true that in summary judgment, the court did not hear oral argument and the court was likely aware or forgot that particular declaration was in the record. But what was before the judge was his stated desire that if it wasn't for this do not rehire notation, I would apply for employment. And as your honors are reviewing this full record, and the respondent does not deny that the declaration with specific positions are there, he would be able to testify at trial as to specific position. So the district court was hung up on the fact that he didn't actually take affirmative steps to apply and seems to construed his declaration against him saying it wasn't enough to say he wanted to return. We think that the declaration is very clear he wanted to return and he did have a position. Counsel, let's suppose that I thought that he wasn't really interested in applying with the county. Is there an alternative route for him to establish standing? Something maybe based on stigma plus reasoning? That is, that this has consequences outside of the county employment? I appreciate the question. It was exactly my next point that we do believe the reputational harm, which is also in the record in his declaration that he was an officer for 36 years and that this do not rehire being the end of his career as an employee of the Sheriff's Department was a deep insult to him. And that as an experience he knows that if you're accused of discrimination and harassment, even if you say it's false, it's a huge stigma and a huge blight on him, especially because he was very proud of being in the first Hispanic Latino Sheriff of Los Angeles. And even, Your Honor, we somehow to one believe the district court got it right on holding the declaration against him and found that somehow the reputation wasn't enough for standing. We believe, Your Honor, it was very much in a complaint. It's at ER 477. We actually asked for injunctive relief and in the alternative nominal damages. And that was also briefed in opposition to summary judgment on this very point. And we think the Supreme Court had made it clear. I always have a trouble pronouncing it out loud, but I believe it's a Zugenbaum case that said in a First Amendment case it's redressable. You can ask for nominal damages. That satisfies the redressability element. And so with all due respect to the district court, Plaintiff Alex V in a way of a said, I was injured by a do not rehire notation in my personnel file. It at the very least made it difficult for me to get employment or otherwise there is a complete bar. It hurt my reputation. I would like injunctive relief to have that removed. And at a bare minimum, I would like nominal damage, which would vindicate my reputational interest. Assume, arguendo, that you prevail on the standing issue. Can you turn to address the merits of the First Amendment retaliation claim? Yes, Your Honor. The respondent below did not argue that Villanueva did not engage in protected activity. And I believe Villanueva showed a triable issue of fact related to both pretext and causation because it's very well established in a First Amendment case in the circuit. You are permitted to establish pretext causation through pretext and you're permitted to prove it through circumstantial. What's the best evidence you have on pretext? Best evidence, Your Honor, is if you look at Esther Lim's complaint, she said she had four examples of harassment. And the exact evidence she gave was don't, it was, Alex Villanueva said, her work doesn't pass legal muster, the deputies are right out of college, flunkies, undefined, and she thought it was about her, it wasn't. Are listening this and will report to the Board of Supervisors, and then the fourth example is completely blank. That, I submit, Your Honor, is not a good faith fact. What about with respect to Huntsman and calling him a Holocaust denier? I mean, isn't that, I mean, I take it your argument is a pretext can be inferred from what you consider to be the weakness of the charges, but falsely calling someone a Holocaust denier, that's a serious blight to their reputation, and why isn't that something that warranted this sort of discipline that they then put in the case? I would say, Your Honor, that with Max Huntsman, he had two things. He did mention the Holocaust denier. He also said falsely he did not use the Max Gustav Huntsman name, and even at the time of his deposition, which was taken, the Max Gustav Huntsman name did not bother him enough that he did not even take that plaque off his desk that had that name. What Villanueva said in his declaration is that he learned that Max Huntsman denied the Holocaust, and he believed it to be true, and I'll also point out where we get to pretext, Your Honor, is Max Huntsman himself, in his interview, he said that Villanueva is right-wing and has a lot of neo-Nazi supporters, and he's trying to rile them up, so I would submit, Your Honor, this was a political back-and-forth. Max Huntsman accusing Alex Villanueva of having some right-wing or fascistic tendencies. Alex Villanueva going back. It had nothing to do... Counsel, were both the Lynn and the Huntsman charges investigated by outside counsel? They were investigated by outside counsel. That's true, Your Honor. And the conclusion of outside counsel was? I would point out, Your Honor, I don't believe it was a truly independent investigation, because I believe that what outside counsel did is simply parrot what Huntsman said and reported to it, and for that, Your Honor, I'll simply say that one of the things that outside counsel found is that Sheriff Alex Villanueva somehow retaliated against Esther Lim ending a letter, but they never looked at the letter. It wasn't attached in the report, and in deposition, Esther Lim admitted, well, actually, you know, my boss, she's the one who disciplined me for those tweets, so it was a legally impossible, both factually and substantively, theory of retaliation that they simply bought, and the other piece of damning evidence, Your Honor, is that there was an inflammatory accusation by other Justice Deputies that Alex Villanueva had said that there were dumb women and women unqualified, and that's in quotes, and he said that on his Facebook Live. Alex Villanueva denied that. Nowhere in the record, which they had, they gathered up together all his Facebook Lives, his KFA radio appearances. He did not say dumb women or women unqualified. What they tried to say is he said the Board of Unsupervisors, he disagreed with them, and somehow, because they're all women, they inferred some type of sex disintent, which is wholly unwarranted, and I will also say, Your Honor, that the District Court did make a finding that this evidence is actually quite thin, but it went on to say there is some evidence and listed it, but I would submit that's exactly the classic error on summary judgment, is that if the record is red and the light, most favorable. I'm not saying that a posting counsel doesn't have an alternative argument or explanation for what I've brought up, but because these are reasonable concerns and they could reasonably thought to be pretextual, appellant Villanueva does have the right to present that to the jury. What do you think is the relevance of the aspect of the factual scenario here where Sheriff Villanueva complains about Ms. Lynn's tweets and then Ms. Lynn perhaps is told by her supervisor not to make those kinds of tweets? How does that fit into the allegations here? I think it fits into the allegations because it shows its pretextual, because Lynn cannot be disciplined by her supervisor, then turn around and say, Alex, in a way of a retaliate against her for tweets. It's that there seemed to be a problem with, and I'd also want to point out, Your Honor, that the Justice Deputies, they are not supervised by anyone in the Sheriff's Office, and the record is very clear. Both the Justice Deputies and Max Huntsman do not interact with the Sheriff on a daily basis. Max Huntsman testified he hadn't spoken to the Sheriff since 2019. The Justice Deputies, in terms of how they interact with the Sheriff's Department, they interact with the undersheriff, a man named Tim Murakami, and he was deposed in this matter and was specifically asked, it's at record it's 13 ER 302 to 308, he was asked, did you do anything to make life of the Justice Deputies, including Esther Lim, more difficult? And he categorically denied it and said no. He treats them with respect. He tried to maintain in a good working relationship and that any problem was he thought those tweets might be a problem, but he certainly didn't take any adverse action. And the relevance to this, Your Honor, is that there's no credible argument that any type of supposed harassment or discrimination impeded any part of the Justice Deputies' jobs or in any way created any type of adverse environment. They weren't even dealing with the Sheriff. They were dealing with Sheriff Murakami, who denied that. And it's also, Your Honor, to be clear, it's not simply that we're saying they got it wrong. It's that all when you stack up all of these inconsistencies and also of these failures to acknowledge, when you read the report, it's not even acknowledged there's no supervision, there's no evidence it was difficult to do a job. When you don't even even acknowledge that, the reasonable inference is that this is a convenient excuse, let's just lay out the evidence completely in a way that's damning to him and then just rubber stamp the complaints of people who admittedly have a political bias. Is it your position that we should look to see whether Lim was politically motivated or Huntsman was politically motivated? And if so, why do you think that's the different point here? I think that you should look to that and also the evidence that the county itself had a clear bias towards Vienna Wave. And for that, Your Honor, I'd point out Mark Ridley Thomas, before he was federally indicted, he did a motion that the Board of Supervisors passed that inspector general, who is Max Huntsman, to explore all options to impeach this sheriff. That's at 12 ER 2574-275. Max Huntsman said that he got that and he did look into that. And so what Vienna Wave's theory was is that when Max Huntsman made this complaint, he was operating on instructions of the Board of Supervisors to look all options to impeach. And the key word in the motion was this sheriff. And when he didn't have any legal options to do it, the complaint that was coordinated with Esther Lim was part of what we would argue a retaliatory and extra extra legal. So we do think the county writ law urge had a bias and that Lim and Huntsman certainly should. Okay, so what do we do with the outside counsel's report? Is that also pretextual? And are the lawyers there acting pretextually on behalf of the county and we can ascribe it to the county? I think you can, Your Honor, for the failure. If you read the report, all it simply did was parrot what Huntsman and Lim said. There wasn't any acknowledgment. What generally how, excuse me, I do employment law myself. What generally we're seeing outside counsel reports, there's some type of acknowledgment of some contrary evidence like, for example, sheriff Vienna Wave didn't actually say that this inflammatory thing. We found no evidence of it. Actually, we looked at this. Lim was disciplined by her supervisor, not Vienna Wave. Well, we have to acknowledge there's a motivation. You didn't say a lot of things that I don't think you dispute, he said. What do you specifically dispute him saying? We just specifically dispute him saying dumb women and women and unqualified, which we think are the most egregious. And we specifically deny, and I think this is agreed to, that he ever made any reference to Lim's gender and her national origin or race. Go ahead, of course, Your Honor. There's some other comments like no male justice deputy staff, the board should explain why they exclude men from their ranks, 20-something woke individuals, flunkies, 25-year-olds who are right out of college. I mean, those you don't dispute? Those we don't dispute, Your Honor, but I did ask the CEO, Opie, about those, and they admitted those comments do not relate to race, gender, or national origin. Sheriff Vienna Wave, in his declaration, stated woke is purely meant as what he saw it as a political ideology that lacks common sense. And the comment you referenced about no males was in the larger discussion of diversity, and I believe if it's in the record, if it's not what the issue was, is that he was not expressing any just being distraught that there were women. The idea was for so long there were only men, now it's only women. We might have swung too far the other way, which is a fairly pedestrian thing to say in the context of political debates. Want to save time for rebuttal? Yes, Your Honor. Okay, all right, then we will hear next from Ms. Ruth. Thank you, Your Honors, and may it please the Court, L.A. Ruth, on behalf of defendants. I just want to back up and sort of briefly set the stage before I begin. The grab-a-minute plaintiff's complaint is that the county Board of Supervisors punished him for opposing it on public issues surrounding COVID policies and ballot measures by placing a file notation in his personnel file. The county presented an unbroken, undisputed mountain of affirmative evidence demonstrating that that was not true. The investigation, as the Court has already touched on, and ultimate panel proceedings were handled by a series of independent decision-makers, some starting with individuals who received the complaint in the beginning, were within his own department while he was sheriff. So is it really a violation of the county policy on equity to refer to staffers as flunkies? That can get you disciplined and a do-not-rehire? That seems, I mean, I would think that people who work for elected officials have to have a little bit thicker skin than merely being called a flunky. That's one of the charges. Some of the others are more serious, but a flunky is misconduct? Well, I would remind Your Honor that the investigator and, more importantly, sort of the investigative report, the outside investigator just gathered facts, didn't make any recommendation or conclusion regarding whether the conduct did or did not violate the policy. When it came back in to the internal panel. Okay, so it's just an objective fact-gathering and not evaluative? Well, it's evaluating exactly all the facts to present it to the panel, which is an independent internal panel, whose exclusive job is to evaluate whether there's been a violation. But I want to answer Your Honor's question. It is the totality of the report, right? It is not just one individual statement, and that statement may not have risen or been actionable on its own. This is not a Title VII or a FEHA, you know, under California law, lawsuit or claim. The county's policy of equity, and the part that the department has its own, sets a higher standard, and part of that is just prudent risk management to identify and eliminate or address problematic conduct that creates a bad work environment, but that also exposes the county to liability. So, to Your Honor's point, you know, and to my colleague's point, we're not talking about needing to prove a claim, you know, about how it impacted the workplace necessarily. It has a higher standard, and there were a number of charges here, and there was evidence to support a number of them. The panel did say, as to one of the charges, there's nothing sex-based here, so we're not going to confirm that, you know, conclude that that was founded, as to that charge. That's on the sexual harassment claim. Yes, sir. Yes. Sorry. What about the issue of standing? Do you think that the plaintiff has standing to assert a defamation claim? I don't believe he has standing to assert a defamation claim, Your Honor. I mean, first of all, I just would like to note that my colleague was referencing the declaration and the record. He was referring to a prior proceeding on motion to dismiss. The motion for summary judgment declaration doesn't say anything like those things. He does not, and that's exactly what the court, the district court identified. That item was in the record, but had not been identified under Rule 56 as one of the items in the record to be considered by the district court in connection with the motion. Is that your position on that? That's right. It wasn't part of the summary judgment record, and he didn't call the court's attention to that declaration in opposing the summary judgment. Just as a common sense matter, do you think it's the case that having a kind of negative notation in somebody's employment file, particularly somebody who's prominent and it gets publicized, would at least be an injury? Well, the injury to your reputation? It is an abstract injury, Your Honor, I would say. And what's important in this case to remember is it isn't public because of something the board did in your prototypical, you know, elected official First Amendment case. Sure, but it's public. The L.A. Times asked for it, right? They were entitled to it under public disclosure rules. But it isn't to anyone at the county? Certainly not the board? They haven't publicized it, but it's now out there, and the county knew once they put it in his records that it could be revealed, right? That it could be discovered. Okay, so it's now out there. It says, do not hire this man. And somebody else at a private firm might well take this into account in deciding whether to rehire the sheriff, or whether to hire the sheriff. Well, I do think it's important that it would have never gone anywhere besides a confidential file were it not for him telling the Los Angeles Times about it in his interview, and continuing to repeat that Max Huntsman is a Holocaust denier, knows about ethnic cleansing, etc. That all goes, I think they may all go to the merits, but we're just trying to figure out whether he can even complain about any of this. Sure. Well, I do believe that, you know, as the court well knows, you need concrete, specific facts. It sounds like if we would adopt your theory of standing, you know, if we were dealing with just, you know, a low-level staffer, who wasn't a prominent elected official, made public statements, etc. Right. And you had a lower-level official who works for, employee who works for the county, and there's some kind of proceeding, and then they end up leaving the job, but then the proceeding continues, and they put do not rehire in that person's file. As to your view, that person cannot challenge that? Well, I still think for standing purposes, for sure, you still need some concrete proof that you apply. Even if it is based on conclusions that they believe are false, and it gets then released, they can't assert a claim for defamation even? Well, I- And set aside First Amendment retaliation, just a plain old, you know, defamation claim. I think I have a couple of points. Number one, there is no evidence that any of this was false. He's taking small pieces- But standing doesn't look at that. Sure, sure. Standing just looks at whether or not it would be, you know, an injury. It seems hard to think that putting negative comments, particularly do not rehire someone in a person's personnel file is not an injury to their reputation for purposes of the minimal standards of Article III. It may not be much injury when you get to the actual defamation. Maybe it's not injury substantively to him for the merits of damage, the damage element of the defamation claim. Right. But if it's an article of Article III injury, you can't even go to court. We can put these freely in people's files, and they can't do anything about it. No, sir. That's not a policy that I am proposing. But that would be the- Well, he hasn't produced any evidence, even his own statements, concerning how and in what way this has injured him. And so that's the lack of concrete, specific facts that he has spoken to. He has continued to run for public office after the complaint, after the file notation. And to this day, he's continued to speak about the file notation publicly and in the media. He's continued to speak about repeat his statements about Mr. Huntsman, et cetera. So if it's in the public eye at all or if it remains there, it isn't because of anything that defendants have done. So I know we're a little bit off a field of understanding question. But my point is only no one on the defendant's side publicized this information. And so it would not have imposed any reputational harm on him were it not his own decision to make it a public issue, as he does with many things. And he freely avails himself, of course, of his First Amendment rights, both as elected sheriff, private citizen, or aspiring to a new elected office to air his views, to criticize individuals in county government that he doesn't agree with. But it equally protects individuals who want to call out his conduct in office. Can I ask you just going back to the merits? So obviously there's a fair amount of disagreement between Mr. Villanueva and others in the county government just about some of his views and their views. And the question I guess I would have is, is there a theory here of circumstantial evidence that says, you know, given all the bad blood between us, anything that is done to me, there's an inference that it's done because of the views I have. Well, the problem there is there's a disconnect, right, because he has publicly clashed with the board and the board has has fired back. Right. And he has even publicly clashed to some extent with Mr. Huntsman in the slam. But he alleges that the board is the one that directed this file to notation to get into his personnel file. And there is absolutely no evidence of that. In fact, the undisputed and substantial numerous individuals testified that was not the case. The board had nothing to do with it. And likewise, the individuals who were in charge with investigating, receiving review, creating the report and making recommendations. A series of independent decision makers all said we didn't know anything about the issues, the covid policies and the ballot measures that is his protected speech in this lawsuit. So what happened before is not particularly relevant to the four corners of what he's alleged alleged, you know, caused him was retaliatory and caused him harm in this. What would need to be. Are we looking then for some kind of smoking gun, you know, email or text that would connect the board to Miss Lim and Miss Huntsman, Mr. Huntsman in connection with the complaints they raised that then led to all of this. Well, you don't need a smoking gun, of course. Circumstantial evidence is sufficient, but he hasn't produced any. I mean, the district court really laid out sort of the three prototypical ways you can use circumstantial evidence to demonstrate that there is some pretext, some timing quirk here that really raises an inference. And there just is not anything like that here. There is absolutely no suggestion. You know, Mr. Villanueva deposed every one of these witnesses from every stage of this proceeding. I understand Mr. Villanueva sat in on the depositions himself. He he heard what every witness said. He knew that everyone said a do not rehire does not mean that you can't reapply. Do not rehire is one tool among many. And he heard every person say, no, the board didn't have anything to do with it. I didn't know anything about these prior conflicts between the board and Villanueva. This is an independent panel with a very specific. I mean, the employees we're talking about are not sort of low level people, right there. They're fairly senior people. One is an inspector general. Right. And so I guess I'm asking from from just a question, whether it's a genuine dispute of fact, is there not a genuine dispute of fact that given the warring environment between everyone here? Right. There's reason there is a circumstantial case to be made that, in fact, all this was motivated politically and that the two people who are making these complaints are aligned with the board. Well, the problem with that is that. The people who were that would require a series of like 13 people to have colluded altogether without a shred of evidence. We turned over every communication. There were 14000 pages of documents. Not a single thing raises that inference. Like, you know, essentially, like the board was completely left out of this, even if Miss Lynn and as the court knows, in the First Amendment context, harboring animus is not enough. It must be the reason. But for this, this final result would not have occurred. Well, what if it what if hypothetically Miss Lemon and Mr. Huntsman were motivated politically? Would that matter? It wouldn't matter because they weren't the decision makers. Right. They reported they made their complaint. They were interviewed multiple times at the outset. At the outset, the complaint comes into his own department, his own department interviews the complainant and says and I believe like relevant witnesses and says this requires an investigation. We're going to send it to an outside law firm, as we typically would do in a circumstance like this. And right now, just based on what we've heard in this interview, we are going to admonish our own sheriff. So his own department receives this and says, this looks like a policy violation. Let's just make sure we try to avoid this. That's all before it even goes to outside law firm, independent oversight council, et cetera. So that would require quite a attenuated and speculative chain of individuals harboring private animus that is not documented anywhere. Lemon Huntsman didn't have anything to do with how this ultimately came out. It was left to the hands of other people. And as the court has focused on some of the prior exchanges between these individuals. But I think that only underscores that the board wasn't in the business of covertly designing a secret conspiracy behind the scenes that basically results in a confidential file notation. If the board had a problem, it said so publicly and directly. Does the record say anything about whether or not there had been other instances in which this kind of a proceeding went forward to a conclusion with respect to a former employee? I would think. I'm sorry. Yes. I don't know that the record reflects that, I believe. Because a lot of times people, you know, use in in other contexts outside elected officials or a lot of people sometimes will resign in the middle in order to avoid the continuation of it. But here it continued after he was voted out of office. It continued. And it's actually quite late after he leaves at the final determinant. It's actually put into the file is is that. Well, this was unusual. It is not uncommon. I believe Lekra veins declaration, who was the person who ultimately imposed the notation testified to this. This is sort of it. But they do, in fact, do these proceedings. Yes. Back to people who've left. Well, yes, because the reason the file notation that is at issue in this case. Was because the individual couldn't be disciplined. Typically, what happens is the panel makes a recommendation and the soup, the individual supervisor decides whether or not that's appropriate and what penalty to impose, what discipline to impose. In a circumstance where the subject of the investigation is no longer employed, they can't be disciplined. So it's a file notation so that should that person apply for a future employment? The person, you know, Los Angeles County has 100000 employees. They can't there's not a centralized place to keep all the details. So it's just a note for purposes. Look at this prior history with this individual. You said in the declaration of the decision maker here, there's a reference to doing similar post departure proceedings for others. Or is that somewhere else? That where the person is no longer employed or cannot be disciplined, which is the case here. He wasn't with the county any longer in any capacity. He had retired before he was elected, and then he lost his election. The the the file notation is basically what they do, because otherwise it would typically be some sort of discipline or admonition or something like that handled by a supervisor. In his case, it was just completing the process. It was just putting that filing, completing the investigation and putting a kind of conclusion there. He had not Mr. Villanueva himself acknowledged that he couldn't have been disciplined even while he was sitting sheriff. So there really wasn't much that could have impacted him. You know, as the court knows, the sort of First Amendment retaliation cases say public censure, public statements saying you violated ethical policies or you are violated. The law when you are in office is insufficient because, as your honor pointed out, when you work, when you are when you work for an elected official, perhaps you do need to have a thick skin. You have to have an even thicker skin when you are that elected official, when you are regularly in the public eye, regularly opposing people legitimately on public issues. So I forgot where I began with that. I think there is some suggestion. I don't know if the court's interested in this at all, but that we somehow are now changing our tune, that we don't believe he was speaking. His speech was protected or that he wasn't speaking in his capacity as a public official. I mean, his lawsuit, the First Amendment complaint, his declaration in support of summary judgment leaves absolutely no room for doubt on the question of what capacity he was speaking. He's in his office for most of these. He's on video. He's it's a press conference or he's wearing his uniform. And he repeatedly has stated throughout his complaint and declaration, I am doing this as a steward of public trust, as the role of the most powerful law enforcement person and as my role to sort of keep the board, making sure the board is doing the things that are right for Los Angeles County. With respect to the adverse action, I want to just point out that the file notation, the district court didn't reach this, but there really is no genuine dispute regarding what the file notation is. Every county person who has experience with this says it's one tool among many. This is what we do. We take a look and we put it in there. And somebody in the future, if somebody future applies, you know, it's a speculative future moment when somebody applies in his motion for summary judgment declaration plaintiff says, you know, yes, I know all about this. And everyone knows that the blacklist, et cetera. But in his deposition testimony and in a book he published while this this case has been pending, he said it never existed before. They invented it to villainize me. They invented it to destroy me. So he he is the one who sort of can't even decide what he thinks the significance of the do not rehire. Isn't this at least genuinely disputed this piece? I don't know that that can be genuine if it's squarely contradictory with his own testimony in this same lawsuit. Well, it does say do not rehire. What's that? It says do not. It's an inapps name and I take your honor's word for it. But it the testimony on this specific question is uniformly in the county's favor. Regarding, you know, my friend has focused a lot on sort of process issues and criticisms of some details of the report or the individuals who brought the report. This isn't a due process claim. He had a due process claim and he abandoned it. What I think is important is there, as the district court properly said, if you look to his citations, none of these none of this evidence exists. There truly is not a single piece of even circumstantial evidence that suggests any impropriety, any falsity. And again, the standard is not. Is it objectively false? The standard is, did these 13 people along the way reasonably believe that what they were saying was true and that it was in violation of the county's policy? That is the standard. So unless the court has questions, I see my time is dwindling. Thank you, counsel. Thank you. Thank you. With your permission, I'd just like to address the argument that somehow plaintiff has to prove some massive conspiracy. I know it's always difficult to make quotations, but the quote from Shakespeare, won't someone rid me of this troublesome priest is generally how you we in the plaintiff's bar view retaliation cases, all of the board, which. The other side concedes did instruct Max Huntsman find all ways to impeach, quote, this sheriff, not a sheriff, not let's look into can we impeach. Let's remove this. Let's remove this sheriff. All it were all it were the reasonable inference requires it is, is that as county employees who are very high up black ravines, they had the chief. It's internal affairs. It's somewhat confusing, but the sheriff's department has a sheriff and chief. She's the very head of internal affairs, as your honor pointed out, not a low level employee. She knew about that. She knew who Villanueva was a political opponent of her current boss, Robert Luna, and the COP members know how much the Board of Supervisors users didn't like it. All they had to be aware of is that they knew the current Board of Supervisors users would really like the chance to bloody his nose with this improper retaliation. That's not that. That's not that's not a conspiracy. It's it's it's straightforward. It's a straightforward application of retaliatory motive, which is pointed out is usually based on circumstantial evidence. And I just also point out both Max Huntsman and Esther Lim reported it to the Board of Supervisors. So I think what she said was literally true. No direct involvement. There doesn't have to be direct involvement when they instruct their agents. It's very rare for the Board of Supervisors. They mostly vote on things. They have staff. They directed it to their staff to do it. So I do think there is an element that we can infer that are there in front there. They're animus that they were effectually waiting this through, excuse me, through their agents. And briefly, with its permission, be in the way of his activity was open and notorious. So we think there is a triable issue was to knowledge in this case. Usually when there's a lack of knowledge, it's very private. There's no reason to know. He was so open and notorious about it. And for the other thing about the protected speech, it's in the brief. But the Kennedy case, there's this clear civilian analog. This circuit has been very hesitant to say a speech is not not protected. The type of things we're talking about, especially the running for office piece. And very briefly, because I know I'm running out of time. We did over your time. I'm sorry. Briefly, your honor. We did file a 28 jail letter. But Ron Regis versus Kaus last month, which I know this panel is familiar with, which we really think speaks to the advert. Adverse action is adverse action. Action is issue. I'll stand. I know more of my time, so I won't discuss Monell or the appropriate standard. But unless the court has any questions, I appreciate. All right. Thank you, counsel. The case just argued is submitted and the court for this session today stands adjourned. Thank you. All rise. Hear you. Hear you. Persons having had business with the Honorable. The United States Court of Appeals for the Ninth Circuit will now depart for this court for this session stands adjourned.
judges: BYBEE, COLLINS, BRESS